IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

DELROY F. KOSKA                                                                                    PLAINTIFF

VS.                                          CIVIL NO. 03-5123

JO ANNE B. BARNHART,
Commissioner, Social Security Administration                                               DEFENDANT

**MEMORANDUM OPINION**

Delroy Koska (hereinafter "plaintiff") brings this action pursuant to § 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of the Social Security Administration denying his application for disability insurance benefits ("DIB") under Title II of the Act.

**Background:**

The application for DIB presently before this court was protectively filed on August 15, 1997, alleging an onset date of June 1, 1983,[1] due to epilepsy, diabetes, back pain, and a bad memory. (Tr. 81, 90, 168). An administrative hearing was held on December 1, 2000. (Tr. 65-22-39). On March 24, 2001, the Administrative Law Judge ( "ALJ") issued an opinion finding plaintiff not to be disabled. (Tr. 65-71). On August 2, 2001, the Appeals Council remanded the case to the ALJ for further consideration of plaintiff's subjective complaints. (Tr. 118-120).

On September 6, 2002, a supplemental hearing was held before another ALJ. (Tr. 23-59). Plaintiff was present and represented by counsel. By written decision dated October 16, 2002, the ALJ found that plaintiff was insured for benefits through September 30, 1996. (Tr. 20). He also found that

---

[1]The alleged onset date was amended to April 30, 1996, because the evidence showed that plaintiff continued to perform substantial gainful activity through that date, in spite of his impairments. (Tr. 14, 27, 166).

plaintiff had an impairment or combination of impairments considered severe. (Tr. 20). However, after reviewing all of the evidence presented, he determined that plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 20). The ALJ then found that plaintiff had the residual functional capacity ("RFC") to perform a full range of medium work requiring only seizure restrictions. (Tr. 20). As such, he determined that plaintiff was not disabled, as that term is defined in the Social Security Act. (Tr. 21).

Although plaintiff filed an appeal, the Appeals Council declined to review this decision. (Tr. 6-8). Subsequently, plaintiff filed this action. (Doc. # 1). This court initially remanded the case to the Commissioner for supplementation of the record with the transcript of the testimony presented at the administrative hearing held on December 1, 2000. (Docs. # 10, 11). Following production of that transcript, on October 26, 2004, counsel for the Commissioner filed a motion to reinstate the case, and the case was reinstated as of October 28, 2004. (Docs. # 12, 13). As such, the case is currently before the undersigned by consent of the parties, and is now ready for final decision. Both parties have been afforded an opportunity to file appeal briefs, but the plaintiff chose not to do so. (Doc. # 7).

**Evidence Presented:**

At the time of the second administrative hearing, plaintiff was fifty-seven years old and possessed a high school education and eighteen months of college credit in mathematics. (Tr. 27). The record reflects that he previously worked as an electrical helper and a cook. (Tr. 14, 28, 31).

Plaintiff testified that he was diagnosed with a seizure disorder in 1979. (Tr. 37). According to his testimony, he experiences approximately one grand mal seizure per month. (Tr. 37-38).

AO72A
(Rev. 8/82)

Following a seizure, plaintiff indicated that he is usually "out of it" for one to five days. (Tr. 39). However, plaintiff also stated that the seizures were "basically controlled" with medication. (Tr. 38). Further, he testified that he did not stop working until 1996. (Tr. 27).

In addition, plaintiff has reportedly been diabetic for a decade. (Tr. 41). He testified that he does occasionally take insulin, but is usually able to control his condition just by watching his diet. (Tr. 42). However, he denied symptoms of diabetic neuropathy or problems with his eye sight. (Tr. 42). Plaintiff reported that his diabetes renders him unable to tolerate the heat. He stated that the Veterans Administration ("VA") had informed him that his diabetes was due to his exposure to Agent Orange in Vietnam. (Tr. 42).

Further, plaintiff testified to having problems handling objects, and difficulty with arthritis in his back, shoulder, and knees. (Tr. 42-43). He indicated that his difficulty handling objects resulted in him dropping knives while slicing foods at IHOP. (Tr. 43). There was also some mention of a congenital problem with the vertebras in his back. As a result, plaintiff reported difficulty standing, but indicated that he thought this was just due to age. (Tr. 44). He also stated that sitting was his best activity. (Tr. 43-44).

Plaintiff also reported problems with his memory. (Tr. 40). He indicated that this began in 1995 or 1996, while he was working as a cook at IHOP. (Tr. 40-41). As a result, plaintiff now has to "write everything down." (Tr. 41).

Plaintiff's wife, Cathy, testified that plaintiff experienced side effects from his medication, including irritability. (Tr. 46). At times, she reported that he became unreasonable and chewed their son out for no reason at all. (Tr. 49). Further, before a seizure she indicated that he became very talkative and was like "a broken record." (Tr. 47). He would then suddenly get quiet and "fall over."

3

Cathy also testified that, when plaintiff was working, he experienced swollen ankles, back and knee pain, and occasional swollen wrists. (Tr. 47). She indicated that the swelling was attributed to edema, for which he was given Lasix.

Plaintiff's son, Alan Koska, also testified. (Tr. 50). He indicated that his father suffered from mood changes. (Tr. 51). Alan also stated that plaintiff would often put the television on the Spanish channel and turn it up really loud. Plaintiff would then just stare at the television or remote control. When asked to turn the volume down, Alan stated that plaintiff could not do so because he did not know how. (Tr. 51).

The pertinent medical evidence reflects the following. In 1979, plaintiff was diagnosed with idiopathic seizure disorder. As such, he was placed on the VA temporary disability retired list in June 1979 with a diagnosis of primary generalized epilepsy. (Tr. 501). After experiencing difficulties with Phenobarbital and Dilantin, plaintiff was successfully treated via Valporic acid. (Tr. 494, 501). An EEG dated May 8, 1988, was abnormal, indicating slow and sharp waves in the right temporal region, along with some bilateral bursts of slow sharp waves more prominent in the right hemisphere, consistent with seizure disorder. (Tr. 451). However, an intracranial CT scan was negative. (Tr. 492). Further, in September 1988, plaintiff's neurologist indicated that he could not state that plaintiff's EEG results were due to seizure disorder, as abnormal EEG's are also seen in seizure-free patients. (Tr. 445). He also noted that plaintiff's livelihood was not adversely affected by his alleged seizure disorder, as per the information provided by plaintiff. (Tr. 445). Then, in August 1989, plaintiff reported that his last seizure was in June. (Tr. 490). As such, his dosage of Valporic acid was increased. (Tr. 490).

AO72A
(Rev. 8/82)

Plaintiff has been treated at the VA Clinic in Fayetteville, Arkansas, since 1992. Diagnoses include seizure disorder and diabetes. In September and October 1992, plaintiff was treated after experiencing knee pain while bowling. (Tr. 434). Ultimately, he was diagnosed with and treated for chronic arthritis in his left knee. (Tr. 420, 424). Progress notes dated November 1992, indicate that plaintiff's diabetes was not well controlled. (Tr. 416). His treating physician expressed doubts concerning plaintiff's compliance with the prescribed diet. (Tr. 416). Records from March 1993 and May 1994 also reveal some concern regarding plaintiff's compliance with treatment. (Tr. 400, 404, 405, 408, 415).

In March 1995, plaintiff was hospitalized due to a seizure that occurred after plaintiff had failed to take his anti-seizure medication for three days. (Tr. 385). A CT scan revealed mild cortical atrophy, but was otherwise unremarkable. (Tr. 386). He was discharged two days later with a prescription for Valporic Acid and an 1800 calorie diet. (Tr. 385). In August 1995, he reported intermittent episodes of dizziness, but no objective findings were noted. (Tr. 371, 382). Then, in September, plaintiff complained of left hip pain radiating down his leg. (Tr. 382). However, no known injury was reported. An examination revealed pain to palpation, as well as tenderness over the hip. Thus, plaintiff was diagnosed with bursitis of the left hip and prescribed Ibuprofen and Soma. (Tr. 382).

In February 1996, progress notes from the VA reveal that plaintiff refused to go on insulin. (Tr. 378). He was then treated for an upper respiratory infection. (Tr. 378).

In March 1996, plaintiff complained of back pain and requested an eye consultation. (Tr. 377). Records indicate that the doctor prescribed over-the-counter pain medication and ordered the eye consultation. (Tr. 377). Then, in May 1996, plaintiff had to quit work, and experienced no more problems with dizziness.

AO72A
(Rev. 8/82)

In June 1997, plaintiff was hospitalized with an elevated temperature, anorexia, listlessness, and loss of memory. (Tr. 359). Diagnostic studies were unremarkable, and plaintiff responded to conservative treatment measures. (Tr. 359, 364, 365, 366). In fact, a CT scan of his head was normal. (Tr. 470). It was felt that his condition might be related to a tick bite. Although doctors continued him on Divalproex NA, Glipizide, and Metformin HCL, no improvement was noted. (Tr. 358). By September 1997, it was noted that his seizures had switched from tonic/clonic seizures to "more absence type" seizures. (Tr. 298).

An MRI of plaintiff's brain performed in November 1997, showed mildly increased white matter signal consistent with myelin pallor with findings possibly attributable to chronic vessel ischemic process. (Tr. 268-269). A neuropsychological examination conducted in December 1997, revealed moderate organic brain syndrome with focal right hemisphere dysfunction and an abnormal MMPI profile, which was consistent with moderately severe emotional distress. (Tr. 350-351). However, no further treatment was provided for this condition.

In April 1998, plaintiff reported left facial weakness and was diagnosed with Bell's palsy. (Tr. 348). An MRI revealed periventricular white matter with ischemic changes. (Tr. 484-485). As such, plaintiff was referred to a neurologist in Little Rock, Arkansas. He was noted to have a very mild left facial nerve lesion. (Tr. 296). On May 12, 1998, plaintiff reported that he had been experiencing two to three seizures per week, lasting for several minutes at a time, and manifested by eyes blinking, mental confusion, and fatigue. (Tr. 294, 482). The neurologist prescribed Tegretol for his seizure disorder. By July 15, 1998, improvement was noted in both of plaintiff's conditions. (Tr. 480). Progress reports dated after this time indicate that plaintiff's seizures were becoming less frequent.

On June 11, 1998, the VA issued a rating decision finding the claimant's grand mal epilepsy had increased to an eighty percent disability rating, as of August 14, 1997, indicative of plaintiff's having experienced at least one major seizure in three months over the past year or more than ten minor seizures weekly. (Tr. 428, 429). As such, he was granted entitlement to disability benefits. Although the VA noted that plaintiff had not experienced a convulsive seizure since 1982, the report documented continued paroxysmal episodes causing an almost daily loss of contact with reality which could not be controlled via Tegretol. Significantly, his neurological examination was unremarkable, and plaintiff indicated that he was continuing to drive an automobile. (Tr. 428-429).

On October 1, 1998, plaintiff underwent a general physical examination with Dr. Jose Abiseid. (Tr. 282-289). His physical findings were unremarkable, leaving him with the impression that plaintiff was suffering from Type II diabetes and epilepsy. However, no limitations were noted and Dr. Abiseid did not make any comments concerning plaintiff's physical abilities. (Tr. 282-289). Later that month, plaintiff reported to his neurologist that his seizures were less common since beginning Tegretol. (Tr. 293, 479).

In November 1998, plaintiff's diet consisted of bacon and eggs, hashbrowns, toast, sandwiches, some chips, pizza, meat, potatoes, gravy, ice cream, and fruits. (Tr. 344). He reported frying foods several time per week. Further, plaintiff stated that he had not been exercising for the length of time recommended by his doctor. (Tr. 344).

In March 1999, records indicate that plaintiff's diabetes remained uncontrolled. (Tr. 339). He admitted to cooking most meals with bacon grease and Crisco. As for exercise, he reported only riding his horse and walking on his farm. (Tr. 339). Records dated May 3, 1999, show that plaintiff was not "strongly committed" to the program, although he had shown some improvement. (Tr. 336). He

7

indicated that he wanted to defer insulin at that time. Further, plaintiff reported that he had not yet begun exercising, as was prescribed by his doctor. (Tr. 336). However, because his glucose level continued to be elevated, he was started on insulin in July 1999. (Tr. 327). At that time, plaintiff indicated that he was walking ½ mile per day, doing yard work, and gardening. He also reported eating cereal for breakfast, although he denied eating sugary cereals. (Tr. 327).

In September 1999, plaintiff complained of chronic lower back pain with radiation after working on the farm. (Tr. 325). X-rays of his lumbar spine revealed bilateral spondylolysis at the L5 level, but no evidence of spondylolisthesis; extensive degenerative change in the articular facets at the lumbosacral junction on the right; and, evidence of arteriosclerosis. (Tr. 326, 329). Therefore, plaintiff was treated conservatively via Flexeril. (Tr. 325).

Progress notes from his diabetic clinic dated this same date also indicate that plaintiff had not been following his diet as prescribed and had gained ten pounds since his last visit. (Tr. 328). In spite of this, however, he had reportedly noted great improvement in his blood sugar levels. Therefore, the doctor prescribed exercise. (Tr. 328). Then, in October 1999, it was noted that plaintiff's seizure disorder was fairly well controlled via Tegretol. (Tr. 300). However, he was directed to continue to adhere to the seizure precautions. (Tr. 300).

In January 2000, plaintiff reported swelling in both ankles, dizziness, excessive weight gain, excessive fatigue, and concern about the possibility of an allergic reaction to Tegretol. (Tr. 315). Examination and diagnostic studies were unremarkable. Thus, plaintiff was prescribed Lasix. By February, plaintiff reported that the swelling in his legs had gone down. (Tr. 309). Further, the doctor noted that he was continuing to improve on Tegretol.

8

On April 5, 2000, plaintiff reported experiencing two seizures that month. (Tr. 304). This had reportedly increased his blood sugar levels. However, plaintiff also reported that he had been working harder on his diabetic program of diet and exercise. (Tr. 304).

A CT scan of plaintiff's head dated June 22, 2001, was normal. (Tr. 469). Then, in September 2001, plaintiff was treated at the United States Hospital in Heidelberg, Germany for dysarthria and gait abnormalities. (Tr. 457). On admission, his Carbamazepine level was elevated at 13 mg/l. Further, an EEG revealed moderate changes of pattern and multiple episodes of sharp waves. After a thirty-hour wait, his Carbamazepine level decreased to 5.9 mg/l and his symptoms improved. As such, doctors suspected a possible Carbamazepine overdose, although they could not rule out the possibility of an acute seizure/inflammatory process. Plaintiff was discharged from the hospital on November 5, 2001, against medical advice. (Tr. 457).

**Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the

findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his residual functional capacity. *See McCoy v. Schwieker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

**Discussion:**

At the onset, we would like to note that, in order to receive DIB, an applicant has to establish that he was disabled on or before the expiration of his insured status. 42 U.S.C. §§ 416(I), 423(I); *Battles v. Sullivan*, 902 F.2d 657, 659 (8th Cir. 1990); *Pryor v. Heckler*, 737 F.2d 1488 (8th Cir. 1984). In the present case, the evidence reveals that plaintiff was insured through September 30, 1996. Therefore, given the fact that plaintiff's amended onset date is April 30, 1996, plaintiff must prove that he was disabled between April 30, 1996, and September 30, 1996, in order to obtain benefits.

We first address the ALJ's assessment of plaintiff's subjective complaints. The ALJ was required to consider all the evidence relating to plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. *Id*. As the United States Court of Appeals for the Eighth Circuit recently observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." *Edwards v. Barnhart,* 314 F.3d 964, 966 (8th Cir. 2003).

After reviewing the entire record in this case, we cannot say that the ALJ erred in finding plaintiff's subject complaints to be less than totally credible. The medical records in the case simply do not support plaintiff's claim. While the medical records do indicate that plaintiff is an insulin dependent diabetic, they do not show that this disorder inhibits plaintiff's ability to perform work-

AO72A
(Rev. 8/82)

related activities. Records dating back to the early 1990s show that plaintiff has been noncompliant with the diabetic diet prescribed, indicating that he continues to eat foods high in starch and fat. *See Kisling v. Chater*, 105 F.3d 1255, 1257 (8th Cir. 1997) (holding that plaintiff's failure to follow a treating physician's recommendation, including recommendations to quit smoking, weigh against his claim of disability). In fact, plaintiff reported preparing fried foods several times per week, indicated that he was not exercising as recommended by his doctor, and refused to go on insulin on at least one occasion. (Tr. 378). *Id*. Further, plaintiff even testified that he suffered from no diabetic neuropathy or vision problems. (Tr. 42). Additionally, he was never diagnosed with peripheral neuropathy or other complications resulting from his diabetes that rendered him unable to work.

We also note that plaintiff carries a diagnosis of seizure disorder, for which he was awarded disability benefits through the VA, effective August 1997. The Eighth Circuit has held that a disability determination by the VA is not binding on an ALJ considering a Social Security applicant's claim for disability benefits, rather findings of disability by other federal agencies are merely entitled to some consideration. 20 C.F.R. § 404.1504; *See Morrison v. Apfel,* 146 F.3d 625, 628 (8th Cir. 1998)*; Jenkins v. Chater,* 76 F.3d 231, 233 (8th Cir. 1996). However, when, as here, the VA determination is made over a year after plaintiff's date last insured, finding plaintiff to have been disabled as of a date nearly one year after plaintiff's date last insured, the ALJ is not required to accept that determination.

With regard to plaintiff's seizure disorder, we note that, in 1989, plaintiff reported to his neurologist that his seizures did not interfere with his ability to work. (Tr. 445). In fact, records indicate that plaintiff continued to work until May 1996, at which time he indicated that he was no longer experiencing dizzy spells. (Tr. 375). The only restrictions placed on plaintiff by his doctors were the traditional seizure precautions that dealt with unprotected heights and dangerous machinery.

12

*See* Social Security Ruling (SSR) 85-15 (1985) (stating that seizure restrictions are an example of restrictions that do not have a significant effect on work that exists at all exertional levels). There were no limitations placed on his ability to perform work-related activities such as sitting, standing, walking, lifting, crouching, bending, crawling, reaching, etc. *See Jones v. Callahan*, 122 F.3d 1148, 1152 (8th Cir. 1997) (holding that a lack of medically ordered restrictions weighs against credibility); *Smith v. Shalala*, 987 F.2d 1371, 1374 (8th Cir. 1993) (same). Thus, aside from this evidence, there is no other evidence to indicate that plaintiff's condition was as severe as alleged.

The records also reveal that plaintiff did not seek consistent medical treatment for his seizure disorder during the relevant time period. *See Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003) (holding that ALJ may discount disability claimant's subjective complaints of pain based on the claimant's failure to pursue regular medical treatment); *Melton v. Apfel*, 181 F.3d 939, 941 (8th Cir. 1999) (holding that plaintiff's failure to seek consistent medical treatment weighed against his subjective complaints). Additionally, the evidence also reveals that plaintiff has not always been compliant with his medication, as he was hospitalized in 1995, due to his failure to take his medication in three days. (Tr. 385). *See Kisling*, 105 F.3d at 1257 (8th Cir. 1997). Another medical record indicates that he had not taken anti-seizure medication for three years. (Tr. 388). Further in 1995, a CT scan of his head revealed only mild cortical atrophy. In fact, plaintiff even testified that his seizures were "basically controlled" with medication. (Tr. 38). *See Johnston v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001) (holding that impairments controllable or amendable to treatment do not support a finding of total disability). Thus, given the fact that plaintiff failed to seek consistent medical treatment for his condition and has not been compliant with his anti-seizure medications, we cannot say that plaintiff's condition renders him totally unable to perform any and all work-related activities.

13

The evidence also reveals that plaintiff has complained of back pain. However, we also note that plaintiff's pain was treated conservatively via Flexeril and over-the-counter pain medications. *See Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (holding fact that physician prescribed conservative treatment weighed against plaintiff's subjective complaints). There is no indication that this treatment was ineffective. *See Haynes v. Shalala*, 26 F.3d 812, 814 (8th Cir. 1994) (lack of strong pain medication was inconsistent with disabling pain). In addition, no standing, sitting, or walking limitations were ever imposed by his physicians or reported by plaintiff. Instead, plaintiff was repeatedly encouraged to exercise. Further, plaintiff testified that he thought his back pain and inability to stand for long periods of time was just due to his age. Therefore, since the mere fact that a person experiences pain is not sufficient to render them disabled, we cannot say that back pain alone was sufficient to render plaintiff disabled. *See Wheeler v. Sullivan*, 888 F.2d 1233, 1238 (8th Cir. 1989) (holding that pain does not necessarily preclude work activity).

Plaintiff also reports disabling memory problems. A neuropsychological examination conducted in December 1997, revealed moderate organic brain syndrome with focal right hemisphere dysfunction and an abnormal MMPI profile, which was consistent with moderately severe emotional distress. (Tr. 350-351). However, no further treatment was provided for this condition. *See Gowel*, 242 F.3d at 796 (holding that lack of evidence of ongoing counseling or psychiatric treatment for depression weighs against plaintiff's claim of disability). Further, the only notations made concerning plaintiff's memory problems were made during a hospitalization in 1997. While plaintiff does contend to experience some memory loss following a seizure, there is no evidence to indicate that this condition is severe enough to restrict his activities. On a form completed for his attorney, plaintiff indicated that he remained able to shop for groceries if he was given a list of items to purchase. (Tr. 220-221). As

14

such, we cannot say that his alleged memory impairments prevent him from performing all work-related activities.

Plaintiff's daily activities also contradict his reports of disabling pain. On his supplemental interview outline, plaintiff reported an ability to dress, shave, go to the Post Office, prepare sandwiches, attend church, watch television, and listen to the radio. (Tr. 179-180). Further, on a questionnaire he completed for his attorney, plaintiff indicated that he sat twelve hours per day and stood and walk two hours per day. (Tr. 219). He also noted an ability to cook several times per day; fix things, grocery shop with a list, and pay bills monthly; and, go to church, visit friends, talk to neighbors, go out to eat or to a movie, and visit relatives. (Tr. 220-221). *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ability to care for one child, occasionally drive, and sometimes go to the store); *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and attend church); *Novotny v. Chater*, 72 F.3d 669, 671 (8th Cir. 1995) (ability to carry out garbage, carry grocery bags, and drive); *Woolf v. Shalala*, 3 F.3d 1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor).

Therefore, although it is clear that plaintiff suffers with some degree of pain, he has not established that he is unable to engage in any gainful activity. *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993) (holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled). Even considered in combination, neither the medical evidence nor the reports concerning his daily activities support plaintiff's contention of total disability. Accordingly, we conclude that

substantial evidence supports the ALJ's conclusion that plaintiff's subjective complaints were not totally credible.

With regard to the testimony of plaintiff's wife and son, the ALJ properly considered her testimony but found it unpersuasive. It is within the ALJ's province to dismiss the testimony of family and friends as this testimony is often motivated by the witnesses desire to see the plaintiff obtain benefits. *See Siemers v. Shalala*, 47 F.3d 299, 302 (8th Cir. 1995); *Ownbey v. Shalala*, 5 F.3d 342, 345 (8th Cir. 1993). In addition, in the present case, we note that the objective evidence does not support the level of severity alleged by plaintiff's family members.

Next, plaintiff contends that the ALJ erred in finding that he maintained the RFC to perform the range of medium level work. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). A disability claimant has the burden of establishing his or her RFC. *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir.2004). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003). "Under this step, the ALJ is required to set forth specifically a claimant's limitations and to determine how those limitations affect her RFC." *Id*.

16

AO72A
(Rev. 8/82)

In the present case, the ALJ relied on the RFC assessment prepared by a consulting physician, plaintiff's medical records, and his subjective complaints before determining plaintiff's RFC. On December 8, 1997, a non-examining, consulting physician completed an RFC assessment of plaintiff. (Tr. 274-281). After reviewing plaintiff's medical records, the physician concluded that plaintiff retained the ability to lift and carry twenty-five pounds frequently and fifty pounds occasionally and sit, stand, and walk for six hours during an eight-hour workday. (Tr. 275). Further, the doctor also indicated that plaintiff should avoid hazards including unprotected heights and exposure to dangerous machinery. (Tr. 278). Based on the above detailed evidence, and given the fact that none of plaintiff's physicians have restricted his activities further or indicated that he is unable to lift and carry twenty-five pounds frequently and fifty pounds occasionally and sit, stand, and walk for six hours during an eight-hour workday, we find substantial evidence to support the ALJ's RFC determination.

We also find that the evidence supports that ALJ's determination that plaintiff's only non-exertional limitations were seizure precautions. (Tr. 21). As seizure precautions are not the type of non-exertional limitations that affect an individual's ability to perform a full range of work, these environmental restrictions were not required to be considered by a vocational expert.[2] *See Lucy v. Chater*, 113 F.3d 905. 908 (8th Cir. 1997) ("[The] ALJ may use the Guidelines even though there is a nonexertional impairment if the ALJ finds, and the record supports the finding, that the nonexertional impairment does not diminish the claimant's residual functional capacity to perform the full range of activities listed in the Guidelines."); SSR No. 85-15, *at* 1985 WL 56857 *8 . Accordingly, the ALJ properly utilized the Medical-Vocational Guidelines and took judicial notice of the fact that medium

---

[2]We do note, however, that the ALJ did call a vocational expert to testify regarding plaintiff's PRW. (Tr. 52).

AO72A
(Rev. 8/82)

level jobs exist in significant numbers in the national economy. Therefore, we find substantial evidence to support the ALJ's decision regarding this matter.

**Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and thus the decision should be affirmed. The undersigned further finds that the plaintiff's Complaint should be dismissed with prejudice.

DATED this 29th day of September 2005.

/s/ Beverly Stites Jones
HON. BEVERLY STITES JONES
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)